IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MICHELE L. WALKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Civil No.  14-cv-1261-CJP[1]** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Michele L. Walker, represented by counsel, seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in March 2011, alleging disability beginning on January 1, 2010. (Tr. 22). After holding an evidentiary hearing, ALJ Anne C. Pritchett denied the application for benefits in a decision dated August 2, 2013. (Tr. 22-37). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 10.

**<u>Issues Raised by Plaintiff</u>**

Plaintiff raises the following points:

1.  The ALJ failed to properly consider the opinions of plaintiff's treating

    psychiatrist and physical therapist.

2.  The ALJ's credibility determination was not supported by substantial
    evidence.

3.  The RFC is conclusory and is not supported by substantial evidence.

4.  The ALJ erred in rejecting the state agency psychologist's and treating
    psychiatrist's opinions as to plaintiff's abilities in social functioning.

5.  The ALJ did not properly consider plaintiff's impairments in combination.

**<u>Applicable Legal Standards</u>**

To qualify for DIB or SSI, a claimant must be disabled within the meaning

of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from

anatomical, physiological, or psychological abnormalities which are demonstrable

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42
U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are
found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case,
the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical
considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.
Most citations herein are to the DIB regulations out of convenience.

by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her

age, education and work experience.  **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).**  See also, ***Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See, ***Books v. Chater*, 91 F.3d 972, 977-78 (7th**

**Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Pritchett followed the five-step analytical framework described above. She determined plaintiff had not been engaged in substantial gainful activity since the date of her application. She found plaintiff had severe impairments of morbid obesity; degeneration of the lumbar spine, cervical spine, bilateral sacroiliac joints, and thoracic spine; degeneration of the left shoulder; degeneration of the bilateral knees and ankles; chronic airway disease with a remote history of chronic asthmatic bronchitis; adjustment disorder with anxious mood; and bipolar disorder with depressed mood and dependent personality. The ALJ determined these impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary level, with physical and mental limitations. Based on the testimony of a vocational expert (VE), the ALJ found the plaintiff was unable to perform her past work. However, there were jobs that existed in significant numbers in the national and local economies that plaintiff could perform. (Tr. 22-37).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

**1.  Agency Forms**

Plaintiff was born on September 6, 1972 and was thirty-seven years old on the alleged onset date. She was insured for DIB through December 31, 2014.[3] (Tr. 167). Plaintiff was five feet seven inches tall and weighed three hundred and forty-two pounds. (Tr. 171).

Plaintiff claimed that arthritis in her neck, a reoccurring infection in her breast, degenerative disc disease, anxiety disorder, a tear in her left knee, a total knee replacement needed on her right knee, chronic bronchitis and asthma, thyroid disease, and gastrointestinal reflux disease (GERD) limited her ability to work. (Tr. 171).  She took Albuterol, Advair, Proventil, and Spiriva for breathing problems; Aspirin for a blood clot, Flexeril as a muscle relaxer; Lasix as a

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  See, 42 U.S.C. §§ 423(c) & 1382(a).

diuretic; Klonopin and Lamictal for anxiety; Ranitidine for acid reflux; Hydrocodone for pain relief; Diclofen as an anti-inflammatory; Singulair for allergies; Sumatriptan for migraines; Synthriod for thyroid disease; Trazadone for insomnia; and Augmentin as an antibiotic. (Tr. 206).

She completed one year of college and had a certified nursing assistant license as well as a food and sanitation license. (Tr. 172). She previously worked as a cook in a restaurant, at the deli counter at Walmart, and a scorer at a shooting complex. (Tr. 172).

Plaintiff completed function reports in March and September 2011. (Tr. 182-190, 212-22). She stated that she could not stand or walk for long periods of time because her knees buckled and her feet swelled. Plaintiff stated that she had shortness of breath, mood swings, and difficulty concentrating. Her left arm went numb down to her fingers as a result of degenerative disc disease. (Tr. 182).

On a daily basis, plaintiff stated that she made sure her daughter was bathed and dressed but her daughter did many things for herself. (Tr. 183, 213). Plaintiff enjoyed reading and spending time with her daughter. (Tr. 186). She made frozen dinners and did laundry once a week. (Tr. 184, 214). However, she needed a friend to help her clean and perform household repairs because her chronic pain prevented her from performing these tasks. (Tr. 184-85). She did not drive often because it was too painful. (Tr. 185). One of her friends did her grocery shopping for her. (Tr. 215). She also had insomnia and awoke every two hours as a result. (Tr. 183).

Plaintiff said she had trouble lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, seeing, remembering, climbing stairs, completing tasks, concentrating, using her hands, and getting along with others. (Tr. 187, 217). She was able to walk twenty feet before she needed to stop and rest for ten minutes. (Tr. 187, 217). She used a cane and wore a neck brace. (Tr. 188, 218).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on June 20, 2013. (Tr. 53). She was five feet seven inches tall and weighed three hundred and thirty pounds. (Tr. 67). She lived with her mother, father, and five year-old daughter at her parents' house. (Tr. 63). She stated that the environment in her parents' home was hectic and often filled with tension. (Tr. 65-66).

Plaintiff was fired from her last job at the deli counter at Walmart because she missed too much work. (Tr. 56). She testified that she had a nervous breakdown about her daughter's father that made her unable to work. (Tr. 57). She saw a counselor to help deal with these problems. (Tr. 58). She stated that her anxiety made her sweat profusely and at times made her unable to speak. (Tr. 65). She smoked half a pack of cigarettes a day to calm her nerves. (Tr. 70).

Plaintiff testified that she was unable to work because on a daily basis she had pain in her shoulders, her neck, both knees, her left arm, her ankles, and her feet. She occasionally used a cane to prevent her from falling. (Tr. 69). She also wore a neck brace every afternoon to help alleviate her neck pain. (Tr. 77). Plaintiff stated that she had a migraine at least once a week. (Tr. 78). She testified

that she often lost the ability to grip with her hands. (Tr. 75). If plaintiff sat for long periods of time she needed to prop her legs up to reduce pain. (Tr. 73-74). Plaintiff could perform a housekeeping activity for fifteen to twenty-five minutes before needing a break. (Tr. 74). She did not think she could sit at a table and perform any work due to the pain in her arms and legs. (Tr. 75).

On a typical day during the summer, plaintiff and her daughter woke up around noon. Plaintiff kept her daughter up later at night so they did not have to wake up early. (Tr. 70). She testified that she had insomnia and slept two or three hours a night. Plaintiff cooked breakfast for her daughter every morning. She had to sit on a stool while she cooked because of her leg pain. (Tr. 71). Plaintiff went swimming with her daughter in the summer because the water helped her back pain. (Tr. 79).

During the school year, she made sure her daughter made it to school and then went back to bed. Some mornings she would go to McDonalds with a friend and drink coffee for a few hours. (Tr. 72). When her daughter returned from school plaintiff would sit in her backyard and watch her daughter play. (Tr. 73). She stated that her daughter was typically with her but she stayed with her parents when plaintiff would go to the store with a friend. (Tr. 67).

Plaintiff had a history of shoplifting. She testified that she wanted to give her daughter everything she wanted and she did not have the funds. The record indicated that plaintiff was arrested twice in one week for stealing from Walmart, and was also charged with shoplifting from a Dollar General and a craft store. (Tr.

82). Plaintiff stated that she was only charged with shoplifting once from Walmart and once from a jewelry store. (Tr. 82-83). The ALJ also questioned plaintiff about her doctor's discontinuation of her Xanax prescription after a failed drug screening. Plaintiff stated that she thought the hospital had used the wrong urine sample and she never misused her prescriptions. (Tr. 83).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform sedentary work, limited to occasional reaching with her non-dominant upper extremity, constant use of her dominant hand for all activities, and frequent use of her non-dominant hand. She could occasionally perform postural activities and could tolerate only occasional exposure to respiratory irritants. Finally, the person could not tolerate any stringent speed or production requirements and was limited to unskilled work. (Tr. 86-88).

The VE testified that the person could not perform any of plaintiff's previous work. However, the person could perform jobs that exist in significant numbers in the national economy. Examples of such jobs are stuffer, surveillance system monitor, and inspector. Upon questioning from plaintiff's attorney, the VE testified that if the person could only perform occasional manipulations with the hands it would greatly diminish the labor market. (Tr. 89-91)

**3.  Medical Treatment**

Plaintiff has extensive medical records for both physical and mental health issues. Her mental health records begin in February 2010 at Human Service Center where she sought treatment for major depression and generalized anxiety disorder. (Tr. 254-61). Plaintiff regularly saw a therapist at Human Services Center for her anxiety and depression through 2013. (Tr. 254-61, 581-93, 799-808, 954-65, 1050-67). Plaintiff was diagnosed with major depressive disorder, generalized anxiety disorder, mood disorder not otherwise specified, bipolar disorder, and dependent personality while at Human Services Center. (*Ex.*, Tr. 259, 592, 806-07, 1055). She was noted to have questionable insight and judgment, difficulty getting along with others, mood swings, and increased anxiety and depression. (*Ex.*, Tr. 259, 582, 589, 804-05, 807, 953, 960, 963, 1061, 1064, 1066).

In 2012, she also began receiving regular treatment from her psychiatrist, Dr. Terrence Casey. She first presented with increased anxiety and Dr. Casey started plaintiff on Abilify and Klonopin. (Tr. 791). Dr. Casey frequently changed plaintiff's medications thereafter. (Tr. 785, 787, 789, 790, 965, 1027). Plaintiff admitted to being a kleptomaniac and often presented with mood swings, difficulty with family, and insomnia. (*Ex.*, Tr. 785, 787, 790-91, 964-65, 1024-27). Dr. Casey diagnosed plaintiff with bipolar disorder, dependent personality, depression, and anxiety. (Tr. 785-91, 964-65, 1024-27).

Plaintiff's has a wide variety of physical health issues on record. Plaintiff's treatment notes indicate she has a history of asthma and bronchitis, shortness of

breath, and chronic respiratory infections. (*Ex.*, Tr. 288, 322, 322, 372, 497, 502, 695, 878, 910, 1000, 1020-21). For relief, plaintiff had an albuterol inhaler, took nebulizer treatments, and was prescribed Spiriva, Advair, Singular, steroids, and Zyrtec. (*Ex.*, Tr. 264, 322, 606, 649, 799, 841, 855, 980, 1000, 1033). She has medical records for treatment with GERD, hypothyroidism, migraines, and hypertension. (*Ex.*, Tr. 322, 519, 606, 799, 841, 855, 873, 1019, 1033). She was prescribed ranitidine for GERD and took increasing dosages of Synthroid for her thyroid. (*Ex.*, Tr. 372, 606, 799, 855, 873, 893, 1000, 1019, 1033).

Plaintiff was morbidly obese. Her weight at the alleged onset date was two hundred and was typically around three hundred pounds in her medical records. (*Ex.*, Tr. 476, 520, 530, 603, 611, 739, 745, 829, 832, 894, 913, 998-99, 1002, 1005, 1069). Plaintiff also had degenerative disc disease, spondylosis, and arthritis that caused neck and back pain. (Tr. 322-23, 442, 446-47, 453-54, 717-18, 890, 912, 946, 1049). She used a surgical collar and a traction device for neck support. (Tr. 603-04, 842-43, 909). She reported shoulder pain, as well as pain in her lumbar and thoracic spine. (Tr. 447, 454, 527, 649, 688).

Plaintiff claimed significant pain in her knees and ankles that caused her to walk with an assistive device for stability. (*Ex.*, Tr. 375, 462, 686, 694, 723, 758-59, 764, 809, 836, 878-89, 907, 1030). She was prescribed physical therapy to help with her neck and lower extremity pain. (Tr. 282, 846, 907). Additionally, she was prescribed numerous pain medications like Norco, Vicodin, Flexeril, and Mobic. (*Ex.*, 308, 322, 372, 490, 602, 685, 740, 770, 833, 841, 844-46, 979,

1024, 1030, 1051). She received facet block injections as well as radiofrequency ablation treatments for her neck pain. (Tr. 316-17, 319-20, 322-23, 844-46).

### 4. Treating Medical Specialists' Opinions

Plaintiff's treating psychiatrist, Terrance Casey, M.D., submitted two medical source statements in October 2012. (Tr. 792-95, 945, 1037-40). Dr. Casey felt plaintiff had moderate limitations in the ability to remember locations and work-like procedures. He opined that she had marked limitations in her ability to understand, remember, and carry out short, simple, and detailed instructions, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to make simple work related decisions, to complete a normal workday and workweek without interruptions, to perform at a consistent pace, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (Tr. 792-94, 1037-39).

Dr. Casey noted that plaintiff had extreme limitations in her ability to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to

changes in the work setting, and to be aware of normal hazards and take appropriate precautions. (Tr. 793-94, 1039-40).

Dr. Casey also submitted a letter stating that plaintiff suffered from depression, anxiety, and mood related issues for which she took medication. He stated that in addition to her long standing psychiatric history she had several medical issues that impaired her ability to function on a daily basis. Dr. Casey stated that in his opinion, plaintiff was a suitable candidate for disability. (Tr. 945).

Plaintiff's treating physical therapist, Mallori Wilson, completed an assessment of plaintiff's capabilities in October 2012. (Tr. 946-50). She felt plaintiff could occasionally lift or carry up to ten pounds but never anything heavier. (Tr. 947). Plaintiff could infrequently stand, but could occasionally walk, or sit. Additionally, she could infrequently push or pull, and occasionally reach, handle, finger, and feel with her right hand. She could infrequently push, pull, or reach, and occasionally handle, finger, and feel with her left hand. Ms. Wilson opined that plaintiff could infrequently operate foot controls, climb stairs and ramps, balance, and crouch, occasionally stoop, and never climb ladders or scaffolds, kneel, or crawl. (Tr. 948-49).

Ms. Wilson felt plaintiff should never be near unprotected heights, moving mechanic parts, or vibrations. Additionally, plaintiff could infrequently operate motor vehicles, be near dust, odor, fumes, pulmonary irritants, and extreme cold

and heat. Ms. Wilson's final assessment was that plaintiff tested within the sedentary physical demand level. (Tr. 949-50).

### 5. Consultative Examinations

Plaintiff underwent a physical consultative examination in June 2011 with Dr. Vittal Chapa. (Tr. 602-09). Plaintiff listed sixteen different medications she took on a daily basis. (Tr. 606). On examination, plaintiff could bear weight and ambulate without aid. She walked with a limp favoring her right knee and was unable to walk on her toes, walk on her heels, or squat. (Tr. 603). Plaintiff's handgrip was 5/5 bilaterally and she could perform both fine and gross manipulations with both hands. She had a limited range of motion of the cervical spine and both knees, but her sensory examination was within normal limits. Dr. Chapa's diagnostic impressions were osteoarthritis of the right knee and chronic cervical pain syndrome. Plaintiff wore a cervical collar for her cervical pain though there was no evidence of cervical radiculopathy. (Tr. 604).

Plaintiff also underwent a psychological consultation in June 2011 with Harry Deppe, Ph.D. (Tr. 610-14). Plaintiff told Dr. Deppe that she was prescribed Klonopin and it was helping her a great deal. (Tr. 611). She informed Dr. Deppe that she last worked in November 2010 and quit due to stress at home. She also told Dr. Deppe that she shopped, cooked, performed housework, and paid the bills on her own. (Tr. 612). Dr. Deppe's clinical impressions were that plaintiff's ability to relate to others, including fellow workers and supervisors was fair to good, and her ability to understand and follow simple instructions, as well as her

ability to maintain attention required to perform simple repetitive tasks, was intact. He opined that her ability to withstand the stress and pressures associated with day-to-day work activity, and her overall general prognosis was good. He diagnosed plaintiff with adjustment disorder with anxious mood. (Tr. 613).

### 6. RFC Assessments

Dr. Julio Pardo, a state agency consultant, assessed plaintiff's physical RFC in June 2011. He reviewed medical records but did not examine plaintiff. He opined plaintiff was able to do work at the light exertional level, i.e., frequently lift 10 pounds and occasionally lift 20 pounds. He felt plaintiff could stand, walk, or sit, for six hours out of an eight hour workday. Plaintiff was limited to frequent pushing and pulling with her upper extremities. (Tr. 634). Dr. Pardo limited plaintiff to frequent bilateral overhead reaching but provided no further postural or manipulative limitations. (Tr. 635-36).

In November 2011, state agency physician Dr. Lenore Gonzales completed a second physical RFC assessment for plaintiff. She also opined that plaintiff could perform work on the light level and sit for six hours during a normal workday. However, she stated that she could only stand or walk for two hours out of an eight hour workday. Dr. Gonzales stated that plaintiff was limited to occasional usage of her hands bilaterally. Additionally, plaintiff should never climb ladders, ropes, or scaffolds and could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. Dr. Gonzales stated that plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and

hazards such as machinery and heights. She reasoned that plaintiff had recurring breast infections, arthritis, a left knee tear, right knee problems, bronchitis, thyroid disease, and GERD. She felt plaintiff's statements regarding her inability to walk for long distances due to her feet swelling and other pain were credible and consistent with the medical evidence. (Tr. 778-84).

In June 2011, Dr. M.W. DiFonso, another state agency consultant, assessed plaintiff's mental RFC. She opined that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 629-30). She based these opinions on plaintiff's generalized anxiety disorder and adjustment disorder with anxious mood. Dr. DiFonso stated that plaintiff's cognitive and attentional skills were intact and adequate for simple one or two step work tasks. (Tr. 631).

<u>**Analysis**</u>

Plaintiff first argues the ALJ erred by failing to properly consider the opinions of plaintiff's treating psychiatrist. She contends that the ALJ erred in her RFC assessment by discounting the state agency psychologist's and Dr. Casey's opinions regarding social functioning. Plaintiff argues that the ALJ erred by improperly analyzing the opinion of her physical therapist and by failing to consider plaintiff's impairments in combination. Plaintiff finally argues that the

RFC assessment was not supported by substantial evidence and that the ALJ erred in forming her credibility determination.

Plaintiff's first argument is that the ALJ erred in failing to properly consider the opinions of plaintiff's treating psychiatrist, Dr. Casey. A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical evidence and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).** The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." ***Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)**(internal citation omitted). It is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions.  See, **20 C.F.R. §404.1527(c)**. In a nutshell, "[t]he

regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue,* 602 F.3d 869, 875 (7ᵗʰ Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. ***Henke v. Astrue,* 498 Fed.Appx. 636, 639 (7ᵗʰ Cir. 2012); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7ᵗʰ Cir. 2007).** If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he must apply the §404.1527(d) factors to determine what weight to give it. ***Campbell v. Astrue,* 627 F.3d 299, 308 (7ᵗʰ Cir. 2010).** Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." ***Berger v. Astrue,* 516 F.3d 539, 545 (7ᵗʰ Cir. 2008); *Elder v. Astrue,* 529 F.3d 408, 415 (7ᵗʰ Cir. 2008).**

The ALJ noted that Dr. Casey submitted two source statements that indicated functional limitations that would result in a finding of disability if adopted fully. The ALJ recites portions of the statements and gave them "little weight" because "they are inconsistent with the treatment notes indicating adequate symptom management with medication and the claimant's own

subjective reporting showing her routinely engaged in activities consistent with unskilled work." (Tr. 34).

Plaintiff contends that the ALJ failed to consider the factors from 20 C.F.R. §404.1527 in determining how much weight to give Dr. Casey's opinions. She states that the ALJ did not acknowledge how long plaintiff was treated by Dr. Casey, that he is a specialist, or that he prescribed and made frequent adjustments to plaintiff's medications. Within these arguments, plaintiff also contends that the ALJ's statement that Dr. Casey's opinions were contradicted by his treatment notes was unsupported.

The Commissioner argues that the ALJ provided sufficient evidence for discounting Dr. Casey's opinions. She states that the ALJ's determination that plaintiff never required more than medication and psychotherapy for her mental illnesses and that her mood was controlled with medications. The Commissioner claims that the ALJ cited specific evidence that showed plaintiff had adequate symptom management and that plaintiff's capabilities and activities were inconsistent with Dr. Casey's opinions.

The ALJ failed to note that Dr. Casey was a specialist, that he was one of plaintiff's regular treating physicians, and that he prescribed and made frequent adjustment to plaintiff's medications. However, the Commissioner is correct in noting that an ALJ need not apply all of the factors in 20 C.F.R. §404.1527(c). See, **Elder**, **529 F. 3d. at 415**. The ALJ attempted to apply the factors of consistency and supportability, which the Seventh Circuit has noted are two of the

most important factors. **Schaaf, 602 F.3d at 875, citing §404.1527(d).** However, this Court agrees with plaintiff that the ALJ's analysis was inadequate.

The ALJ failed to indicate how Dr. Casey's opinions were inconsistent with his treatment notes. Dr. Casey's notes show consistent changes to plaintiff's medication regimen. (Tr. 785-87, 789-90, 964-65, 1024, 1026-27). He repeatedly noted she had difficulty getting along with her family and could not stop shoplifting. (Tr. 785-87, 964-65, 1024-25, 1027). As plaintiff points out, her treatment notes from her therapist corroborate the fact that plaintiff's mental impairments were not necessarily well controlled by medication. She repeatedly noted that plaintiff was not making progress, had questionable insight and judgment, and had increased anxiety and depression. (Tr. 589, 804-05, 807, 953, 960, 963, 1061, 1063-64, 1066).

Additionally, the ALJ failed to show how plaintiff's subjective reporting of her daily activities did not support Dr. Casey's opinions. The Seventh Circuit has repeatedly held it is appropriate to consider daily activities but it should be done with caution. The ability to perform daily tasks "does not necessarily translate into an ability to work full-time." **Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013).** The Seventh Circuit also held that an ALJ cannot equate caring for a family member and performing housework with work in the labor market. **Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005); Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006); Beardsley, 758 F.3d 838**.

The ALJ did not specify which daily activities of the plaintiff were consistent with unskilled work in this portion of her opinion. However, in analyzing plaintiff's daily activities elsewhere in the opinion, the ALJ stated that plaintiff shopped, cooked, did housework, watched television, paid bills, and cared for her daughter. Plaintiff was able to bathe and dress herself. (Tr. 30). The ALJ stated that one psychotherapy note indicated she was "active." The ALJ opined that each of these activities required abilities similar to those required for sedentary unskilled work. (Tr. 31).

While plaintiff does take care of her daughter and perform minimal household chores, the ALJ overlooked the limitations she faced in the tasks she felt made her capable of sustained work. Plaintiff stated that she made frozen dinners and did laundry once a week. (Tr. 184, 214). She needed a friend to help her clean, perform household repairs, and take her to the store because her chronic pain prevented her from performing these tasks alone. (Tr. 184-85). Plaintiff lived with her parents who helped care for her daughter. (Tr. 67). Even if plaintiff's daily activities indicate she is capable of some form of work, the ALJ fails to articulate how these daily activities are in contrast to Dr. Casey's opinions. This is error.

The Commissioner's reliance on the ALJ's argument elsewhere in the opinion that plaintiff never received more than medication and psychotherapy for her mental illnesses is not well taken. The ALJ did not explain how this course of treatment was lacking or what would be expected of someone who has a disabling

mental impairment. The ALJ is not a doctor and it is error for her to assume a certain course of treatment is less serious when no suggestions to this idea have been made by medical professionals. The Seventh Circuit has held that an ALJ is not permitted to "play doctor" and her decision "must be based on testimony and medical evidence in the record, and not on [her] own 'independent medical findings.'" ***Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).** It seems as though that is what ALJ Pritchett did in the case at hand when she noted that plaintiff's treatment history consisted of "nothing more than medication and psychotherapy." (Tr. 34).

The Commissioner argues that the treatment notes that support Dr. Casey's opinions do not establish plaintiff is totally disabled. While this may be true, his records do indicate more limitations than the ALJ acknowledges as the portions of the record that do support of Dr. Casey's opinions were entirely excluded from the ALJ's opinion. In analyzing the evidence, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion. ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).** While she is not required to mention every piece of evidence, "[she] must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." ***Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).** While the ALJ did not have to agree with Dr. Casey's opinions, she did need to minimally discuss the portions of the record that do not support her decision. Her failure to do so makes her assessment of Dr. Casey's opinions inadequate.

The Seventh Circuit has held that discounting the opinion of an examining physician requires good explanation, which ALJ Pritchett failed to provide in the case at hand. ***Beardlsey v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014).** The ALJ is "required to build a logical bridge from the evidence to his conclusions." ***Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).** While the ALJ was not required to give Dr. Casey's opinions controlling weight, she needed to adequately explain why his opinions were discounted. ALJ Pritchett simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012)., citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

<u>**Conclusion**</u>

The Commissioner's final decision denying Michele Walker's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g)**.

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:  March 17, 2016**


**<u>s/ Clifford J. Proud</u>**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**